# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DANIEL LADON STENNIS, # 184620, :

  Plaintiff,      :

vs.         :  CIVIL ACTION 20-0446-JB-N

CYNTHIA STEWART, *et al.*,  :

  Defendants.     :

## REPORT AND RECOMMENDATION

Plaintiff Daniel Ladon Stennis, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). After careful review, it is recommended that Defendants' Motion for Summary Judgment be granted and that this action be dismissed with prejudice. (Doc. 25, PageID.63; Doc. 28, PageID.291).

## I. Proceedings.

### A. Complaint. (Doc. 1)[1]

According to Stennis, his incarceration at Holman Correctional Facility (Holman) began in April 2018. (Doc. 1 at 4, PageID.4). While there, "on or about January 27,

---

[1] Stennis's complaint is signed under penalty of perjury. (Doc. 1 at 12, PageID.12). Therefore, it is being treated as an affidavit opposing summary judgment. *Sammons v.* Taylor, 967 F.2d 1533, 1544 n.5 (11th Cir. 1992); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986). As such, it is subject to the constraints of Rule 56(c)(4), Fed.R.Civ.P. *Thomas v. Stewart,* 2022 WL 636104 (S.D. Ala. 2022) (unpublished) (a complaint/affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated").

2020," the Alabama Department of Corrections (ADOC) made a public announcement that Holman "was going to close down (condemn) due to electrical problems and 'Toxic' conditions," which were "mold, back up sewage in the pipes, contaminated waters and e[tc]." (*Id.*). Stennis continued to drink the water and shower in it, which was mentally challenging after the announcement. (*Id.*). At times, his bowel movements were irregular, and he had diarrhea and stomach aches for which he used sick call. (*Id.*). He knew that something was wrong with the water because the officers were given, or brought, water bottles "since he can remember." (*Id.*). Moreover, his dorm ran two sinks of hot water constantly (for which no explanation was provided). (*Id.*). And he was unaware of the substantial risks of consuming and using contaminated water. (*Id.*).

Stennis contends that his Eighth Amendment rights were violated when "they" did not notify him of the water's contamination. (*Id.* at 5, PageID.5). He maintains that ADOC did not offer to give inmates bottled water, and at one time, they sold bottled water at the canteen, but at the time of the complaint's filing, it was no longer for sale due to Defendant Raybon's order. (*Id.*). Stennis asserts that "being forced to drink 'contaminated water' pose[d] 'an unreasonable risk of serious damage to [his] future health and safety' . . . [and] denied [him] basic human needs." (*Id.*).

Named as Defendants to his Complaint are Warden Cynthia Stewart, Commissioner Jefferson S. Dunn, Warden Terry Raybon, Warden Phillip Mitchell, Captain Regina Bolar, Captain Vencini Smith, and Deputy Commissioner Cheryl Price. (*Id.* at 8-11, PageID.8-11). Stennis claims that each Defendant knew of the contaminated water prior to the January 27, 2020 announcement, some for the past two years, and yet failed to inform the inmates of the water's contamination. (*Id.* at 8-10,

PageID.8-10). He further alleges that Defendants, except for Defendants Dunn and Price, advised the officers to drink bottled water and use hand sanitizers but not the inmates. (*Id.*). Defendants Stewart and Raybon are also charged with not creating a plan to provide uncontaminated water to inmates. (*Id.* at 9, PageID.9). Defendant Dunn is alleged to have authorized the public statement, which indicates that Defendant Dunn knew of the infirm conditions but did not inform the prisoners until the prison was about to be condemned, thereby forcing Stennis to drink contaminated water. (*Id.* at 8, PageID.8).

For relief, Stennis is seeking $700,000 from each Defendant in punitive damages and $180,000 from each Defendant in compensatory damages and the Court to order an immediate investigation by an environmental agency into this matter. (*Id.* at 12, PageID.12).

### B. Defendants' Answer and Special Report. (Doc. 25, PageID.65)

In their Answer, Defendants raise, among other things, the defenses of failure to state a claim upon which relief can be granted and qualified immunity. (*Id.* at 23-24, PageID.26-27). And the Special Report contains Stennis's inmate movement history reflecting that he was transferred to William E. Donaldson Correctional Facility on June 30, 2021 from Holman (Doc. 25-2 at 1, PageID.91), Declarations from Defendants Stewart and Raybon (Doc. 25-3, PageID.95; Doc. 25-10, PageID.285, respectively), Stennis's pertinent medical records (Docs. 25-4, -5,-6, PageID.98-211), and a declaration from Ruth Naglich, ADOC's Associate Commissioner for Health Services, stating that she provides oversight to the ADOC's Office of Health Services and ADOC's health services contractors and advising of ADOC's Covid preparation and protocols

3

(Doc. 25-7 at 1, PageID.213), to which was attached CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (CDC's Guide) (Doc. 25-8, PageID.229) and "ADOC – Office of Health Services – What you should know about Coronavirus disease (COVID -19)" (ADOC's COVID-19 Information) (Doc. 25-8, PageID.258).

In Defendant Stewart's declaration, signed under penalty of perjury (Doc. 25-3 at 1, PageID.95), she describes Stennis's claim against her as being for a violation of his constitutional rights for "failing to warn him of, and subjecting him to, toxic water being supplied to Holman." (*Id.*). She asserts that "Mr. Stennis' allegations are false, and [she] den[ies] them in their entirety." (*Id.*). Specifically, she states that the water is not toxic, as Stennis maintains, because the water is the same water supplied to Atmore, Alabama, residents from West Escambia Utility. (*Id.* at 2, PageID.96). Regarding plumbing issues, she did not receive any correspondence, such as request slips, from Stennis concerning a plumbing issue, which would have resulted in another housing assignment for him, and maintenance would have been notified. (*Id.*). Defendant Stewart advises that bottled water was sold to inmates at Holman's canteen. (*Id.*). She further states that she "has not harmed Mr. Stennis in any way" and that it impossible for ADOC "to eliminate the risk of an upset stomach or digestive issues for all inmates at all times, any such symptoms complained-of by Mr. Stennis are unrelated to any conduct on [her] part." (*Id.*).

Defendant Raybon's affidavit mirrors Defendant Stewart's affidavit except that he explicitly denies "instruct[ing] correctional officers to avoid the facility's water because of contamination issues." (Doc. 25-10 at 1, PageID.285). He also denies Stennis's

4

allegations in their entirety.  (*Id.*).

Stennis's medical records reflect that on March 26, 2020, he complained of having diarrhea for three or four days, a headache, and runny nose.  (Doc. 25-5 at 33, 35, PageID.174, 176).  He stated that he had two bowel movements a day, and that preceding the diarrhea, he had eaten oranges and pineapples.  (*Id.* at 35, PageID.174).  Stennis was prescribed Pepto-Bismol to take four times a day as needed for diarrhea beginning on March 26, 2020 and ending on March 28, 2020.  (Doc. 25-4 at 32, PageID.129; Doc. 25-6 at 33, PageID.212).  Stennis also put in a Sick Call Request, which was reviewed on June 5, 2020, because his "stomach ha[d] been bothering [him] for quite some time now off/and on. Irregular bowel[] movements. . . ."  (Doc. 25-25 at 21, PageID.162).  And the medication records also show that Stennis was being treated for constipation from December 12, 2020 to February 12, 2021.  (Doc. 25-6 at 24, PageID.203).  The medicals records do not show other instances of gastric issues, but they do reflect that Stennis was seen and treated for a variety of complaints.[2]

Ruth Naglich's declaration reflects that in early March 2020, ADOC began planning for its response to Covid-19, which included monitoring supplies of "PPE, soap, paper towels, and disinfectants[.]"  (Doc. 25-7 at 3-4 PageID.215-216).  She also relates that the other measures undertaken included "providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways

---

[2] Defendants provide Stennis's medical records "for the relevant period."  (Doc. 25 at 4, PageID.66).  These records reflect many nursing encounters while at Holman for a variety of ailments and conditions, namely, constipation, colds, dry eye from sinuses, sinus, rectal bleeding, headache, stiffness in hands, burning pain in inner thigh, shoulder and neck pain, cut finger, broken tooth, aching wrists, injured wrist, eyeglasses, and mental health.

and dining areas to allow frequent hand-washing." (*Id.* at 9, PageID.221). "[S]taff and inmates [were] encouraged to maintain personal hygiene, especially hand-washing." (*Id.* at 15, PageID.227).

### C. Response to the Defendants' Special Report and Answer (Response).

After receiving the notice of the conversion of the Answer and Special Report to a motion for summary judgment[3], Stennis filed an unsworn Response to the Defendants' Special Report and Answer (Response) (Doc. 33, PageID.334) and his Affidavit (Doc. 33-2 at 2, PageID.362). In the Response, Stennis alleges that he was housed at Holman from 2018 to 2020 under Defendant Stewart when the contaminated water and moldy conditions became evident. (*Id.* at 1, PageID.334). During that time, when he "was subjected to those toxic and moldy plumbing[4] conditions that caused Holman Prisoner's water supply to be contaminated," Defendant Raybon was a Warden II. (*Id.* at 2, PageID.335). Stennis also maintains that Ruth Naglich's declaration "has no place in this litigation . . . about toxic conditions at Holman that were confirmed on national television on 1/27/2020" and, therefore, charges that ADOC is trying to allege that Holman was closed due to the Covid-19. (*Id.* at 2-3, PageID.336-37). But Stennis maintains that the origin of his strange illnesses was revealed because of ADOC's statement. (*Id.*).

Stennis asserts that his allegations about water contamination are not false as he

---

[3] The conversion order advised Stennis of the significance of a motion for summary judgment and of the requirements for his response to it. (Doc. 28, PageID.291).

[4] Elsewhere Stennis refers simply to mold and does not associate it with the plumbing. (*see* Doc. 1 at 4-5, PageID.4-5; Doc. 33-2 at 1, PageID.361). He also simply refers to the water as being contaminated with no specific substance identified as causing the contamination. (*Id.*).

has only repeated what the ADOC spokesman said on January 27, 2020, on national television on behalf of the Commissioner – "that Holman was being condemned because of 'toxic' conditions[.]" (*Id.* at 3, PageID.336). He "felt" the water was contaminated because the guards brought bottled water from home and "were provided hand sanitizer to wash their hands" on orders from Defendants Dunn and Price. (*Id.*). "[T]he word circulating through the prison . . . was that Warden Cynthia Stewart would warn all the new guards as well as [current Holman employees]. . .to not drink or wash their hands with that water," which he acknowledges is hearsay. (*Id.* at 5-6, PageID.338-339). He maintains Defendants are trying to mislead the Court that Defendant Stewart did not say the foregoing statement because her only statement about bottled water is that it was sold at the canteen. (*Id.* at 7-8, PageID.340-341).

Stennis argues that Defendants want the Court to believe that his complaint started on January 27, 2020, but that is the date that on which he finally realized there were toxic conditions at Holman Prison. (*Id.* at 8, PageID.341). And because Defendants cannot explain their January 27, 2020 announcement, they talk about Covid-19 even though Covid-19 has nothing to do with his claims for drinking contaminated water and for being exposed to moldy plumbing. (*Id.* at 8, PageID.341).

Stennis contends that toxic conditions mean poisonous chemicals in liquid form were at Holman; it does not refer to electrical or moldy plumbing. (*Id.* at 10, PageID.343). He asserts that ADOC does not deny that it made the announcement. (*Id.*). When he heard the announcement, he realized why the guards "were drinking bottled water and using hand wipes with hand sanitizers." (*Id.* at 11, PageID.344). Instead of warning inmates prior to January 27, 2020 about the dangers of drinking and

bathing in unclean water, each Defendant just told officials or officers, and Defendant Price never told Defendant Stewart to tell the inmates.  (*Id.* & *Id.* at 9, PageID.342).  According to *Hudson v. Palmer,* there was a duty to tell inmates of contaminated water, and by not doing so, they were deliberately indifferent to his health and safety.  (*Id.* at 13-14, PageID.346-347).  Defendants claim his injuries are *de minimis* although he has not been examined for illnesses caused by drinking poisonous and contaminated water and for living around moldy plumbing.  (*Id.* at 14, PageID.347).  Moreover, *Helling v. McKinney* [509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)] does not require that an inmate await the tragic event before seeking relief.[5]  (*Id.* at 15, PageID.348).  *Helling* only requires that he show that a condition of his confinement poses an unreasonable risk of harm to his future health or safety.  (*Id.*).  He contends that exposure to contaminated water is actionable where there is a fear that it will cause a gastrointestinal ailment.  (*Id.*).

Plaintiff also claims that two water lines serve Holman even though Defendants claim the water at Holman is the same as the water that the City of Atmore is drinking.  (*Id.* at 15, PageID.348).  However, the Atmore Utility Board states that it uses seven wells and utilizes four treatment plants.  (*Id.* at 16, PageID.18).  Therefore, Stennis argues that "[i]f Holman Prison was closed down because of its toxic well water . . ., surely the City of Atmore is not drinking from the same contaminated well."  (*Id.* at 16, PageID.349).[6]

---

[5] In *Helling v. McKinney*, *supra*, a prisoner brought a § 1983 action for his exposure to environmental tobacco smoke in prison.

[6] In Stennis's Response, he advises the Court of his confusion with Defendants' labeling of exhibits.  (Doc. 33 at 4, PageID.337).  It is noted that most of the exhibits are not identified with

Stennis points out that the Eighth Amendment provides that an official may be liable "if the official knew of and disregarded an excessive risk to inmate health or safety." (*Id.* at 16, PageID.349). Stennis maintains the officials knew years before the announcement of the toxic conditions, i.e., the contaminated water, or at least several months before Holman was closed. (*Id.*). They knew how to reduce the harm – by providing Stennis and other inmates with bottled water and hand sanitizers. (*Id.* at 16, PageID.349).

**D. Stennis's Affidavit.** (Doc. 35-2, PageID.361).

Stennis states that on January 27, 2020, he watched breaking news that said that "Holman Prison [was] going to close and be condemned because of toxic conditions." (Doc. 33-2 at 2, PageID.362). He searched for the definition of "toxic" and came to realize that "it had something to do with 'poisonous' conditions, like contaminated water and mold," because "electrical or roofing problems. . . would not be toxic." (*Id.* at 1-2, PageID.361-362). He noticed that the guards were not drinking from the faucets . . . and were all using hand-wipes instead of sticking their hands under the. . . faucets." (*Id.* at 2, PageID.362). "[T]he word was that the wardens, including Cynthia Stewart, were informing their officers not to use the faucet water because it was contaminated." (*Id*). He "began to mysteriously break out with le[s]ions and rashes." (*Id.*).

---

labels on them, and the exhibits that are labeled, the labels do not correspond to the exhibit numbering in this action, as those exhibits bear labeling from another case. *See* Doc. 25-7, PageID.214; Doc. 25-8, PageID.229; Doc. 25-9, PageID.278. Moreover, the electronic listing of exhibits, which Stennis does not have access to, is not easy to use because there is no description of an exhibit, such as, Stewart Declaration, rather the exhibit's description is just Exhibit 3, which is already identified as Attachment 3. (*see* Doc. 25*)*.

## II. Law Governing Summary Judgment Motions.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphases in original); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'") (emphases in original) (citation omitted).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." [*Celotex Corp. v. Catrett,* 477 U.S. 317,] 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24, 106 S.Ct. 2548.
>
> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences

must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp.2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).  The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165.

The nonmoving party must produce substantial evidence to defeat a motion for summary judgment; a "mere scintilla" of evidence is insufficient*. Id.*  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied,* 516 U.S. 817 (1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (same).

### III.  Discussion.

### A.  Eighth Amendment Standard for Conditions of Confinement Claim.

The Eighth Amendment's proscription against cruel and unusual punishment prohibits prison officials from exhibiting "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1874, 128 L.Ed.2d 811 (1994).  At the same time, "the Constitution does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981).  All that is required under the Eighth Amendment is that prison

officials "ensure that inmates receive adequate food, clothing, shelter, and medical care, and ... 'take reasonable measures to guarantee the safety of the inmates[.]'" *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (citations omitted); *see Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir.) (the Eighth Amendment requires a prisoner receive "reasonably adequate food, clothing, shelter, and sanitation."), *cert. denied,* 475 U.S. 1096 (1986). Prison conditions constitute cruel and unusual punishment when they result in the "unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399.

To prevail on an Eighth Amendment claim alleging inhumane conditions of confinement, an inmate must make both an objective and a subjective showing. *Farmer*, 511 U.S. at 834, 114 S.Ct. at 834. The objective component requires an "extreme deprivation . . . [to] make out a conditions-of-confinement claim[,] [b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society[.]' " *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (citations omitted). "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). A court looks to "contemporary standards of decency" to determine whether the challenged conditions resulted in a deprivation of "the minimal civilized measure of life's necessities" or "basic human needs." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

> [U]nder the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Hudson v. McMillian*, 503

> U.S. 1, 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). The
> challenged condition must be "extreme." *Id.* at 9, 112 S.Ct. at
> 1000. While an inmate "need not await a tragic event" before
> seeking relief, *Helling v. McKinney*, 509 U.S. 25, 33, 113
> S.Ct. 2475, 2481, 125 L.Ed.2d 22 (1993), he must at the
> very least show that a condition of his confinement "pose[s]
> an unreasonable risk of serious damage to his future health"
> or safety, *id.* at 35, 113 S.Ct. at 2481.

*Chandler v. Crosby,* 379 F.3d 1278, 1290 (11th Cir. 2004). Thus, "[u]nder the objective

component, the plaintiff must demonstrate 'a substantial risk of serious harm.'" *Swain v.*

*Junior,* 961 F.3d 1276, 1285 (11th Cir. 2020) (the risk of Covid-19 satisfied the objective

component).

The subjective component requires a showing that prison officials have been

"deliberate[ly] indifferen[t]" to a substantial risk of serious harm. *Farmer*, 511 U.S. at

828–29, 114 S.Ct. at 1974. "[A] prison official cannot be found liable under the Eighth

Amendment for denying an inmate humane conditions of confinement unless the official

knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. at

1979. And the official must disregard that risk by conduct that is more than negligence

– "or more simply stated, whether they 'recklessly disregard[ed] that risk[.]'" *Swain,* 961

F.3d at 1285 (citation omitted). However, prison officials "who actually knew of a

substantial risk to inmate health or safety may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at

1287 (citation omitted). This standard "incorporates due regard for prison officials'

unenviable task of keeping dangerous men in safe custody under humane conditions."

13

*Id.*

In addition to satisfying these components, "[a] plaintiff must also show that the constitutional violation caused his injuries." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see Williams v. Bennett*, 689 F.2d 1370, 1384-85 (11th Cir.) (same), *cert. denied*, 464 U.S. 932 (1983).

### B. Objective Component.

Turning to the objective component, Stennis needs "to present evidence in support of [the] element[s] of [his] case on which [he] bears the ultimate burden of proof." *ThyssenKrupp Steel*, 926 F. Supp.2d at 1289. Summary judgment will be entered against a nonmovant "who fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he substantive law will identify which facts are material." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2521. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts .... [w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott,* 550 U.S. at 380, 127 S.Ct.at 1776.

14

Turning to Stennis's evidence before the Court, his complaint is signed under penalty of perjury (Doc. 1 at 7, PageID.7) and his affidavit is sworn before a notary public under penalty of perjury, although nowhere is it stated that his affidavit is true and correct (Doc. 33-2 at 1-2, PageID.361-62). Defendants have also submitted, among other things, Declarations of Cynthia Stewart (Doc. 25-3, PageID.95) and of Terry Raybon (Doc. 25-10, PageID.295) and Stennis's medical records (Docs. 25-4, 25-5, 25-6, PageID.98, 142, 184).

Notably, among all evidentiary submissions in this action, there has not been produced the statement or video recording of the statement heard and/or seen by Stennis where an ADOC spokesperson stated on January 27, 2020, that the conditions at Holman were toxic. (Doc. 1 at 4, PageID.4). Stennis provided only his personal statement that an announcement was made that conditions at Holman were toxic. (*Id.*). There are no other affidavits agreeing with Stennis about the announcement. He lists the "'toxic' conditions [as] dealing with 'mold, back up sewage in the pipes, contaminated waters and e[tc]s.'" (*Id.*). Is this list created by Stennis or is it a list from the announcement? (*Id.*). While on the other hand, Defendants Stewart and Raybon maintain that Stennis's allegations are false, and they deny that the water was toxic and state that Holman's water is the same water used by the City of Atmore. (Doc. 25-3 at 1-2, PageID.95-96; Doc. 25-10 at 1-2, PageID.285-86). Without the actual statement or a video recording of the announcement, the Court does not know whether ADOC's spokesperson articulated that the conditions were "toxic," or whether upon seeing or hearing comments about the conditions at Holman, Stennis deduced the conditions

were "toxic," and which conditions were toxic and the criteria used to determine that they were toxic.

### 1. Claim for Contaminated Water.

Even though Stennis describes "toxic conditions" as including contaminated water, mold, and backed-up sewage in the pipes (Doc. 1 at 4, PageID.4), his chief focus is on a claim for contaminated water.[7]  Nonetheless, Stennis provided no direct evidence that the water from the faucet from which he drank and bathed was contaminated.  There is no report reflecting that the water was tested in some manner that showed contamination and that the contamination was harmful to him.  *Cf. Hall v. Skipper*, 808 F. App'x 958, 960-61 (11th Cir. 2020) (defendants were granted summary judgment because the prison's bacteria level in its water was complied with standards and therefore was safe, and the plaintiff failed to show that the bacteria caused his infection); *Cary v. Hickenlooper*, 673 F. App'x 870, 875 (10th Cir. 2016) (the objective prong was not met when the plaintiff failed to show how a brief exposure to minimally increased uranium levels in the prison's water detected in a test one month caused or exacerbated his medical conditions).  Additionally, Defendants Stewart and Raybon in their Declarations state that "[t]he water supplied to Holman is the same water being supplied to the residents of the City of Atmore, Alabama and [it] is provided by West Escambia Utility."  (Doc. 25-3 at 2, PageID.96; Doc. 25-10 at 2, PageID.286).  *Cf. Brown v. Crawford,* 906 F.2d 667 (11th Cir.) (finding the county jail's water was not unclean because the City of Miami residents drank the same water) *cert. denied,* 500 U.S. 933

---

[7] "They violated my Eighth Amendment rights when they didn't notify me of contamination problems of the water."  (Doc. 1 at 5, PageID.5).

(1991).

Stennis's medical records reflect only two instances of gastric issues, when he complained to the Health Care Unit (HCU) on March 26, 2020 and on June 5, 2020. (Doc. 25-5 at 33, 35, PageID.174,176, complaint of diarrhea for three to four days after eating oranges and pineapple; Doc. 25-5 at 21, PageID.162, complaint that his stomach was bothering him for some time now off and on with irregular bowel movements). No reference to contaminated or toxic water was contained in the medical records even though he reported his gastric issues to the HCU after the January 27, 2020 announcement. The medical records show that the gastric issues were not an ongoing issue. Moreover, no correlation was made between the water and the two noted gastric episodes, but for Stennis's speculation. He has not produced medical findings that the water was the cause for his gastric issues. Rather, he states that he has not been examined for illnesses caused by drinking contaminated water or living in an environment "infested" with moldy plumbing. (Doc. 33 at 14, PageID.347).

Furthermore, Stennis questions Defendants' reasoning for filing Ruth Naglich's Declaration (Doc. 27-7, PageID.213), CDC's Guide (Doc. 25-8, PageID.229), and ADOC's COVID-19 Information (Doc. 25-8, PageID.258). During the time that Stennis was housed at Holman, the Covid-19 pandemic began. Naglich stated that in early March 2020, they began preparing for the pandemic. (Doc. 25-7 at 3, PageID.215). In response to the Coronavirus, ADOC educated inmates and staff on proper hygiene practices to protect them from the virus and "provid[ed] and restock[ed] antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing." (Doc. 25-7 at 9, PageID.221). Staff and

inmates were also directed to use hand sanitizers.  (Doc. 25-7 at 9, PageID.221; Doc. 25-9 at 4, PageID.281).  The relevance of Naglich's affidavit and the coronavirus documents to this action is to show the heightened concern for hygiene while Stennis was at Holman beginning in March 2020 and the use of hand sanitizers at that time and afterwards, although much of the other information contained therein was unnecessary. Stennis did not identify any specific time periods related to the officers drinking bottled water or using hand sanitizer, except to mention that he realized on January 27, 2020 that "[o]fficers have been given or [were] bringing their own bottled water since [he] can remember." [8]  Drinking bottled water or using hand sanitizer may be considered hygienic measures taken during the pandemic (or before), but neither demonstrates that Holman's water was contaminated.

In Stennis's affidavit, he defines "toxic" as poisonous conditions, such as contaminated water and mold, and belatedly states in his affidavit that the toxic conditions caused lesions, rashes, and other illnesses.  (Doc. 33-2 at 1-2, PageID.361-62).  Regarding his skin issues, his medical records reflect that on March 30, 2020, he completed a sick call request stating that he worked in the kitchen with a lot of chemicals and wanted cream for his hands.  (Doc. 25-5 at 32, PageID.173).  The

_____

[8]      Stennis has not clearly presented the time periods involved in his action.  He completed the complaint form indicating that the complained of action occurred on or about January 27, 2020.  (Doc. 1 at 4, PageID.4).  Later, he states that January 27, 2020 is the date on which he became aware of the toxic conditions at Holman.  (Doc. 33. at 8, PageID.341).  Then, elsewhere in the complaint, he refers to ADOC keeping inmates away from "their policies and practices" for his previous two years of incarceration at Holman.  (*Id.* at 5, PageID.5).  And he also alleges in the complaint of his "fear of knowing that [he] is still drinking and showering in this place [which] is a real mental challenge for [him]!"  (Doc. 1 at 4, PageID.4).
         Stennis was at Holman from April 28, 2018 until June 30, 2021 (Doc. 25-2 at 1, PageID.91), and he sued for the two years prior to the complaint's filing on September 8, 2020 (Doc. 1 at 5, PageID.5).

nursing encounter reflects that he was exposed to disinfectant chemicals and that both hands had dry skin patches that were peeling, which he said had been present for a couple of months.  (*Id.* at 31, PageID.172).  He was given hydrocortisone cream and instructions for healing his hands.  (*Id.*).  On November 9, 2020, he complained to a nurse of itching.  (*Id.* at 7, PageID.148).  No rash or pain was noted, but he was given hydrocortisone cream.  (*Id.*).  On April 26, 2021, he complained of his hands breaking out, skin peeling, and spots on his stomach.  (Doc. 25-4 at 44, PageID.141).  On April 27, 2021, he received an ointment.  (*Id.* at 42, PageID.139).  He denied exposure to irritants or a behavior change, but it was noted that there were no signs or symptoms of skin irritation.  (*Id.* at 43, PageID.140).

In *Hall v. Sawyer,* 2022 WL 152235 (11th Cir. 2022), the Eleventh Circuit held that a prisoner "has a constitutional right to safe drinking water."  *Id.* at *2 (citing *Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993)).  In *Hall*, the defendants were granted summary judgment on a claim for contaminated water brought by a civilly committed detainee.[9]  (*Id.* at *2-3).  The water in *Hall* was tested and was shown to be safe.  (*Id.* at *2).  Nonetheless, the plaintiff filed an affidavit along with three civilly committed persons who asserted the water contained black particles, lead, and other harmful chemicals.  (*Id.*).  Without determining if a genuine issue had been created regarding the objective component, the court had found that a genuine issue had not been created with respect to the subjective component because the defendant drank the water, and the water's testing showed no abnormalities.  (*Id.*).  It is worth

---

[9]     Eighth Amendment case law is the standard that is applied to the Fourteenth Amendment, due process rights of those civilly committed.  *Hall*, 2022 WL 152235, at *2 (quoting *Bilal v. Geo Care, LLC*, 981 F.3d 903, 915 (11th Cir. 2020)).

noting that the *Hall* court had more evidence produced by the plaintiff when it ruled for the defendants than Stennis has presented in this action.

Moreover, much earlier in *Brown v. Crawford,* 906 F.2d 667 (11th Cir.), *cert. denied,* 500 U.S. 933 (1991), the Eleventh Circuit affirmed the district court's decision finding that the water was not unclean because City of Miami residents drank the same water and that the plaintiff had not submitted a doctor's diagnosis or medical evidence that drinking the water caused his stomach pains and headaches. *Id.* at 670. Thus, the district court concluded that the plaintiff's allegations of drinking contaminated water was unsubstantiated and totally speculative, thereby failing to create a genuine issue of material fact. (*Id.*).

Here, Stennis's evidence of contaminated water is a mere scintilla at best. Much more is required to make a showing on which a jury could find that Holman's water presented a substantial risk of serious harm. Thus, Horton has failed to create a genuine issue of material fact as to the objective component of an Eighth Amendment claim. Inasmuch as both components of an Eighth Amendment claim must be satisfied, the subjective component will not be addressed because Stennis has failed to meet his burden regarding the objective component on his contaminated water claim. *Chandler,* 379 F.3d at 1297.

### 2. Claim for Mold and Backed-up Sewage in Pipes.

Stennis also mentions in his complaint about mold and backed-up sewage in the pipes. (Doc. 1 at 4, PageID.4). Mold is mentioned again in his affidavit when he advises that on national television it was announced that Holman "was closing down to be condemned because of 'toxic conditions[,]'" with toxic meaning poisonous conditions

like "contaminated water and mold." (Doc. 33-2 at 1, PageID.361). Regarding the plumbing, Defendants Stewart and Raybon advise that inmates may use a request slip to make staff aware of issues, or they can notify an officer in their unit about plumbing issues, which will result in another housing assignment and notification to maintenance personnel of the situation. (Doc. 25-3 at 2, PageID.96; Doc. 25-10 at 2, PageID.286). Beyond the brief and conclusory mentioning of mold and backed-up sewage in the pipes, no other details were provided by Stennis regarding these conditions. Nor are there facts demonstrating that they led to an injury or presented a serious risk of substantial harm to him. Stennis's mere assertions of these conditions in a conclusory manner without supporting factual allegations are a scintilla and are therefore insufficient to create a genuine issue of material fact. *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion"); *Fullman v. Graddick,* 739 F.2d 553, 556-57 (11th Cir. 1984) (finding that vague and conclusory claims are subject to dismissal). Thus, the objective component has not been established on Stennis's claims mold and backed-up sewage in the pipes.

## IV.  Conclusion.

Based upon Stennis's failure to establish a violation of the Eighth Amendment, it is recommended that Defendants' Motion for Summary Judgment be granted and that this action be dismissed with prejudice, with Plaintiff Daniel Ladon Stennis taking nothing from Defendants.[10]

---

[10]     Stennis did not indicate the capacity in which he was suing Defendants. "[T]he course of proceedings typically indicates the nature of the liability sought to be imposed." *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994). "The essence of an individual

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. Gen.LR 72(c). The parties should note that under Eleventh Circuit Rule

---

capacity suit is that the plaintiff is seeking to recover from the individual defendant, who is personally liable for the judgment."  *Id.* at 1577.  Thus, the present action appears to be an individual capacity action.

Inasmuch as a violation of the Constitution has not been established, Defendants would be entitled qualified immunity from damages in their individual capacities, as well.  *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct *does not violate clearly established statutory or constitutional rights* of which a reasonable person would have known.'" *Id.*(emphasis added).  It also extends to the situation where a violation of a constitutional right has not been established by the pleadings, such as here.  *Id.* at 239, 129 S.Ct. at 820.

However, to the extent, that Stennis may have intended his claims against Defendants to be in their official capacity, it would be an action against the official's office and, as such, it is a suit against the State itself.  *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). The State and its officials acting in their official capacities are not "persons" for a section 1983 action.  (*Id.*).  Moreover, the Eleventh Amendment's sovereign immunity bars an action by its citizens for money damages except if the State waives its Eleventh Amendment immunity or Congress abrogates the immunity.  *See Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1524 (11th Cir. 1990). Congress has not abrogated Alabama's Eleventh Amendment immunity in § 1983 cases, nor has the state of Alabama consented to suit.  *Id.* at 1525; *see also* ALA. CONST. Art. I, § 14 (providing that Alabama "shall never be made a defendant in any court of law or equity").

Notwithstanding the foregoing, "official-capacity actions for prospective relief are not treated as actions against the State."  *Will,* 491 U.S. at 71 n.10, 109 S.Ct. at 2312 n.10 (citing *Kentucky v. Graham*, 473 U.S. at 167 n.14, 105 S.Ct. at 3106 n.14; *Ex parte Young*, 209 U.S. 123, 159–160, 28 S.Ct. 441, 453–454, 52 L.Ed. 714 (1908)).  Stennis's request for relief is of this nature, that is,  he requests that "[t]he courts should order an im[m]ediate[] investigation from the environment [sic] agency on this matter." (Doc. 1 at 12, PageID.12).  The undersigned, however, found that a violation of the Constitution has not been established and, therefore, this request is without merit in addition to being vague and inappropriate.  Federal courts do not mandate that state agencies take certain actions such as to investigate.  *Bailey v. Silberman*, 226 F. App'x 922, 924 (11th Cir. 2007) (unpublished).  And, to the extent that involvement of a federal agency is sought, the vagueness prevents a claim from being stated.  *See Fullman,* 739 F.2d at 556-57 (vague and conclusory claims are subject to dismissal).

3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this 11th day of August 2022.


/s/ KATHERINE P. NELSON
**UNITED STATES MAGISTRATE JUDGE**